**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Maurice Oscar BYRD,
Defendant-Appellant.**

**No. 64656.**

Supreme Court of Missouri,
En Banc.

Sept. 11, 1984.
Rehearing Denied Oct. 9, 1984.

**498**

John Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for defendant-appellant.

Robert J. Maurer, Asst. Public Defender, Twenty-First Judicial Circuit, Clayton, for plaintiff-respondent.

GUNN, Judge.

Defendant was convicted of four counts of capital murder and sentenced to death on each count. As aggravating circumstances supporting the death sentences, the jury found that each murder was committed while defendant was engaged in the other capital murders, and that each murder was committed for the purpose of receiving money or some other thing of value.[1] Jurisdiction of defendant's appeal is in this Court pursuant to Mo. Const. art. V, § 3.

On appeal, defendant raises the following points: 1) that the death-qualification of jurors resulted in a jury which did not represent a fair cross-section of the community and was biased in favor of conviction; 2) that the trial court's refusal to permit individual voir dire resulted in the exposure of jury members to prejudicial information regarding pre-trial publicity; 3) that the state was improperly permitted to impeach its own witness with prior inconsistent statements; 4) that the state was improperly permitted to recall its witness to the stand to recant her earlier testimony, after causing her to be arrested for perjury; 5) that defendant's wife was compelled to testify against her husband; 6) that the state was improperly permitted to use hypnotically-enhanced testimony; 7) that the state would have been permitted to introduce evidence of defendant's bad character to counter his proposed evidence of good character; and 8) that the death penalty is cruel and unusual punishment and is disproportionately applied to black defendants convicted of killing white victims.

We conclude that defendant's points are without merit and affirm the convictions and the sentences imposed.

Defendant does not challenge the sufficiency of the evidence; however, a prelimi-

---

1. Section 565.012.2(2), (4), RSMo Cum.Supp. 1983. This section was repealed by Laws 1983, S.B. 276 § 1, and replaced by § 565.032, RSMo Cum.Supp.1983. The effective date of S.B. 276 was extended to October 1, 1984, by S.B. 448, 1984 Mo.Leg.Serv. No. 3 at 169.

nary review of the state's case will aid in the discussion of defendant's arguments.

At approximately 7:40 a.m. on the morning of October 23, 1980, employees arrived at the Pope's Cafeteria in the West (St. Louis) County Shopping Mall to discover that death had held a high carnival. Three employees had been shot to death in the cafeteria office. A fourth employee was still alive, although mortally wounded. She had been shot in each eye and died a little more than a week later. Over four thousand dollars in malgained lucre had been taken from the office safe.

At the time of the murders, defendant worked for an exterminating service. The cafeteria, which he had serviced two days before, was one of his customers. On the morning of the killings, the bookkeeper for his employer arrived at work at approximately 7:50 a.m. Defendant was already there with another person, seated in a car that was different from the one normally driven by him. Defendant began his route that morning in the company car but called in at 10:00 a.m. to report that he was ill. He returned the company car to his employer and then left for the day. At the time he returned the car, he discussed the radio news reports of the killings with his supervisor. Defendant did not return to work again and made no attempt to pick up his final paycheck.

On October 27, 1980, defendant moved to Savannah, Georgia, to join his putative wife Sandra Sanders Byrd and their small child who had moved there the previous month. When he arrived, defendant had a briefcase containing a substantial quantity of money, a portion of which—$2,000—was immediately spent to purchase a car.

Devastating to defendant's theory of innocence was the testimony of Sandra Sanders Byrd that defendant had told her that he had killed some people in order to join her and the baby in Savannah. This testimony was bolstered by the former husband of Sandra's sister who testified that the defendant told him that he had committed a robbery in a victuallery in Missouri, killing a number of people in the process. A cellmate of defendant also testified that defendant had related to him that he had robbed a restaurant in St. Louis and in so doing had shot four people.

Sandra Sanders Byrd's testimony was not easily obtained. When called to the stand to testify for the state, she became recalcitrant and refused to acknowledge on recall that she had related to law enforcement authorities that defendant had told her of the killings. At this point she was withdrawn from the stand, charged with perjury and required to spend a night in jail on the charge. After a promise that the charge would be dismissed, she was recalled and testified in accordance with a prior statement made.

Defendant's first point concerns the death-qualification or "Witherspooning" of the jury, dubbed such from *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). His attack is essentially two-fold. First, defendant contends that striking venirepersons who indicated that they could not consider imposing the death penalty resulted in a jury which did not represent a fair cross-section of the community and which was prone to conviction. Second, defendant maintains that the death-qualification process should not have been conducted in the presence of other panel members. These same contentions were considered and rejected in *State v. Guinan*, 665 S.W.2d 325, 329 (Mo. banc 1984), and *State v. Preston*, 673 S.W.2d 1, (Mo. banc 1984). *See also State v. Lashley*, 667 S.W.2d 712, 714 (Mo. banc 1984). Nothing in defendant's argument alters our conclusion in this regard, and further discussion on this issue avails nothing.

Defendant's second argument also concerns the voir dire process. Defendant contends that the trial court erred in denying his request to voir dire the individual venirepersons outside the hearing of the other panel members with regard to pre-trial publicity. The sole reason pertaining to pre-trial publicity which was urged in support of defendant's motion was the existence of emotionally charged and prejudicial publicity surrounding the circumstances of

**500**

the present case. Defendant now complains that he was prejudiced by the remarks of a venireperson relative to an unrelated crime for which defendant was arrested in Georgia. We cannot conclude either that the trial court abused its discretion in ruling on defendant's motion or that defendant was prejudiced as a result of voir dire.

■ The trial court ruled, in response to defendant's motion, that voir dire would be conducted in panels of twelve. The trial court also stated that if any venireperson indicated familiarity with pre-trial publicity, further questioning would be permitted at the bench, outside the hearing of the other panel members. The procedures employed in the conduct of voir dire are discretionary with the trial court. *Guinan*, 665 S.W.2d at 329. Clearly the procedures employed here provided adequate safeguards against the potential for prejudice warned of by defendant. There was therefore no abuse of the trial court's discretion in that regard.

■ As voir dire progressed, however, defendant's trial counsel did not in the following instance take advantage of the procedure authorized by the trial court. While questioning one venireperson who had already indicated some familiarity with pretrial publicity, counsel inquired whether he remembered anything other than what the other panel members had already related. He responded, "Only that, I believe, I recall reading where he was arrested somewhere in Savannah, Georgia, on a murder charge." Defendant's subsequent motions to disqualify the panel and to declare a mistrial were denied.

■ Defendant claims that panel members were improperly exposed to evidence of other crimes by the venireperson's statement. However, it is clear that whatever prejudice inured from this statement resulted from counsel's failure to conduct voir dire examination on this topic at the bench. As with invited error, *see State v. Ray*, 647

S.W.2d 522, 524 (Mo. banc 1983), a party may not complain of prejudice which his own conduct creates.

■ Furthermore, the possibility that actual prejudice resulted from the statement is remote. The jury would later learn that defendant moved to Savannah shortly after the killings. They could reasonably assume that attention first focused on defendant's involvement in the St. Louis killings while he was in Georgia. The obvious conclusion, then, is that he was arrested for these killings while he was still in Georgia. Nothing in the venireperson's comment suggested any other sequence of events, particularly that defendant was arrested in connection with an unrelated killing.

Defendant's next three points relate to the testimony of Sandra Sanders Byrd. First, defendant maintains that Ms. Byrd was not competent to testify against him because she was his wife. In support of his contention, defendant looks to § 546.-260, RSMo 1978 which provides that the spouse of a criminal defendant may not be required to testify in the defendant's trial. *See State v. Manning*, 657 S.W.2d 301, 302 (Mo.App.1983), holding that error occurred in allowing a wife to testify against her husband. That section also states that a spouse testifying at the option of defendant shall not be permitted to disclose confidential communications made between them in the relation of husband and wife. § 546.260, RSMo 1978.

The prosecution stipulated to the fact that defendant and Ms. Byrd were married in Georgia in September of 1978. However, it also introduced a marriage license issued in 1976 to defendant and Evelyn McQueen.

Defendant testified that he had indeed married Evelyn McQueen, that he had never divorced her prior to the marriage ceremony with Ms. Byrd and that the so-called second marriage was not valid.[2] A police

2. Q [Prosecutor] Didn't you know you never divorced your first wife?

A [Defendant] No, I never divorced my first wife.

officer testified that in 1981 he had interviewed Evelyn McQueen.

■ The substance of defendant's argument is that the state's evidence was insufficient to support the conclusion that the marriage between defendant and Sandra Byrd was invalid. He maintains that he is aided in his argument by a presumption of the validity of a second marriage. This factual presumption places the burden of production on the party contesting the validity of the second marriage to establish that the first marriage had not been dissolved either by dissolution or by the death of the former spouse at the time of the second marriage. *Carr v. Carr*, 232 S.W.2d 488, 489 (Mo.1950).

■ Defendant is correct that Missouri courts have generally recognized this presumption in the context of civil litigation where the existence of a valid marriage is a material issue in the action. *See In re Marriage of Sumners*, 645 S.W.2d 205, 208 (Mo.App.1983); *see also* Annot., 14 A.L.R.2d 7 (1950). We are also cognizant of the general statement that the presumption is not overcome by proof that the prior spouse was alive at the time of the second marriage and that one party to the first marriage did not obtain a divorce from the other. *Maier v. Brock*, 222 Mo. 74, 120 S.W. 1167, 1170 (1909).[3] However we conclude that defendant's admission that his second marriage was invalid was sufficient to overcome the presumption of its validity. That statement goes beyond the assertion that he did not obtain a divorce from his first wife and yields the conclusion that neither party to that marriage obtained a divorce prior to the second marriage.

■ Our conclusion that the presumption of the validity of the second marriage was

met in this case is further buttressed by the policy underlying § 546.260. That section is intended to protect the marital relationship and to foster family peace. *State v. Euell*, 583 S.W.2d 173, 175 and 177 (Mo. banc 1979). *But see State v. Shafer*, 609 S.W.2d 153 (Mo. banc 1980), tracing history of spousal immunity and applying holding of *Euell* prospectively. That policy is not served by preventing the state from calling a putative spouse as a witness where the defendant admits that the marriage in question was known by him to be a mere pretense. In that context, it is clear that the defendant does not seek to preserve a familial harmony but to exact an absolute evidentiary privilege—the basis for which his own statements belie.

■ The corollary argument that defendant's statements to Sandra Byrd were privileged as marital communications under § 546.260 is equally unavailing. This privilege is intended to encourage full disclosure and trust between the parties to a marriage. *Euell*, 583 S.W.2d at 175, 176. Its applicability to a given communication depends upon the maker's intention that the communication be confidential in nature. *State v. Damico*, 513 S.W.2d 351, 361 (Mo.1974). "The test is whether the intent exists to rely on the confidence and intimacy of the marital relation in making the disclosure to the partner of the marriage." *People v. McCormack*, 278 A.D. 191, 104 N.Y.S.2d 139, 144 (1951). A person may not justifiably rely on the confidentiality of a marital relationship if he has no reason to believe that relationship exists. *See United States v. Neeley*, 475 F.2d 1136 (4th Cir.1973), holding that a defendant who had never divorced a wife could not enter into a valid subsequent marriage and thereby obtain the benefit of exclusion-

Q [Prosecutor] Well, do you think a second marriage would be a valid marriage?
A [Defendant] At that time of the marriage, it wasn't, no, sir, it wasn't.

3. We note that the trial court chose to apply Georgia law relative to the presumption of validity. Georgia's presumption requires only that the party challenging the validity of a second marriage prove that the first spouse was alive at

the time of the second marriage. The burden then shifts to the party claiming the validity of the later marriage to show that the first marriage was dissolved by divorce. *Johnson v. Johnson*, 239 Ga. 714, 238 S.E.2d 437 (1977). The choice of law question need not be answered here, as we conclude that the presumption was overcome regardless of which standard is applied.

ary rules based on the existence of a subsequent valid marriage.

During direct examination by the prosecutor, Sandra Byrd became evasive in answer to certain questions. After she acknowledged that she loved the defendant and wanted to continue living with him, the prosecutor was permitted to lead her in his questions on the basis that the witness was hostile. Then came the inquiry causing this point of appeal.[4] Ms. Byrd was asked whether the defendant had stated to her that he had killed three people in St. Louis to be with her and their child. She denied that he had made this statement. She was then asked whether she had related such a statement to law enforcement officials. Three times Ms. Byrd denied or could not remember making such a statement. Objection came from defendant's counsel on the ground of repetition.

After Ms. Byrd clarified that she could not have made the statement, the prosecutor asked if she would recognize her voice in a tape recording of a session with law enforcement officials. Defendant objected to the playing of the tape recording, contending that it would be improper impeachment of the state's own witness. The objection was overruled, and the tape was played before the jury. On the tape, Ms. Byrd stated that defendant told her he had killed three people in St. Louis to be with her and the baby. Ms. Byrd then admitted that it was her voice on the tape recording but also denied making the statements.

Defendant next objected to the playing of an additional portion of the tape on which Ms. Byrd related that she and defendant had only $150 in their St. Louis bank account. Her testimony was a denial of any financial straits and that she could not remember how much was in the ac-

count insofar as specific figure. Defendant argues that there was no basic inconsistency between her court testimony and the statements on the tape and, therefore, the objection should have been sustained.

■ As a general rule, the state may not impeach its own witness. *State v. Preston, supra.* The rule is equally applicable to any party to a case, whether civil or criminal. *State v. Armbruster,* 641 S.W.2d 763, 767 (Mo.1982); *State v. Sutton,* 454 S.W.2d 481, 488 (Mo. banc 1970); *see* Comment, *Impeaching One's Own Witness in Missouri,* 37 Mo.L.Rev. 507 (1972). A witness may be impeached as hostile, however, if two requirements are met. First, the witness must, by reason of answers which are inconsistent with previous statements, surprise the party propounding the questions. *Armbruster* at 767. Second, the answers as given must state facts which in effect make the witness a witness for the other side. *Id.; State v. Preston, supra.*

■ Defendant and the state strenuously join issue over whether the prosecutor was surprised by the testimony of Sandra Byrd and whether she could be impeached by the state. In order to justify impeachment with prior inconsistent statements, it is not sufficient

> that that witness merely fails or refuses to tell the facts which he had therefore related extrajudicially or fails to tell all of such facts but, in order to warrant impeachment in the mode stated, the witness must go further, and by relating wholly contradictory facts become in effect a witness for the adverse side.

*State v. Drummins,* 274 Mo. 632, 204 S.W. 271, 276 (1918).[5]

---

**4.** Prior to this line of inquiry, defendant's counsel urged that the prosecutor knew what the witness' trial testimony would be and could therefore not claim surprise for impeachment purposes.

**5.** *See United States v. Long Soldier,* 562 F.2d 601 (8th Cir.1977), in which the court held that the government was properly permitted to impeach its own witness after the witness denied that

defendant made an inculpatory statement to him. The court distinguished between a witness' failure to recall an incriminating statement and an affirmative denial that defendant made an admission of guilt, stating that in the latter case "there is at least an exculpatory inference that something did not take place as alleged and impeachment should be allowed." *Id.* at 605. However, as the court noted, Fed.R. Evid. 607 changed the common law rule requir-

■ It is clear, however, that Ms. Byrd's conduct established her as a hostile witness to the state. She maintained a steadfast loyalty to him and obvious reluctance to testify against him. Her responses were antithetical to the state's interest and contrary to the prosecutor's legitimate anticipation. It was therefore no abuse of discretion by the trial court from its superior vantage point to allow the state to treat Ms. Byrd as a hostile witness and permit examination into the matters contained in the tape in the manner accomplished. *State v. Preston, supra.*

■ Further reason exists for allowing the testimony regarding the tape to stand. It was consistent with other evidence properly before the court. On recall after the perjury charge circumstance, Ms. Byrd testified that defendant told her that he killed some people to be with her and their child in Savannah, although she did not remember that he stated how many or where they were killed. Thus, if the tape evidence had been admitted erroneously, which it was not, other evidence was properly before the court establishing essentially the same facts. Therefore no prejudice to defendant and no reversible error would have existed. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982).

The witness' failure to recall the location or number of the killings admitted to does not affect our conclusion. The fact that the killings were committed for the purpose of joining his wife and child in Savannah clearly indicated that they occurred before defendant left St. Louis. Furthermore, the distinction between "some" and "three" does not significantly alter the probativeness of the statement. In comparing the probative value of these two versions of the statement, changing the quantifier does not substantially change the relative likelihood either that the people referred to were killed in an unrelated crime or that the people were killed at Pope's Cafeteria. The distinction is particularly insignificant

in light of other statements by defendant that the killings indeed took place in a restaurant in St. Louis, that they took place during a robbery and that a total of four people were shot.

■ The state's interrogation of Sandra Byrd as a hostile witness regarding the financial condition while living in St. Louis was also without error. The jury was aware that defendant was working for an extermination service and took home approximately $100 per week. Sandra testified that her mother had given her the money to travel to Savannah with her child. She also testified on redirect that she and defendant had "done without a lot." Furthermore, the jury was instructed to consider any prior inconsistent statements only for the purpose of determining the weight and credibility of the witness' testimony and not as evidence of guilt. *See State v. Nolan*, 423 S.W.2d 815, 819 (Mo. 1968), regarding removal of prejudicial effect of evidence by jury instruction. Under the circumstances present here, we cannot conclude that the interrogation of the witness affected the substantial rights of the defendant, particularly as it fell within the ambit of proper examination of a hostile witness.

■ During the second portion of the state's closing argument the tape of Ms. Byrd's transcribed statement pertaining to defendant's admission of the killings was played for the jury. Defendant alleges error thereby. The state responds by noting that the tape was played to rebut defendant's closing argument that Ms. Byrd had been threatened and coerced by perjury charges to testify in accordance with the taped statement and that the statement had been obtained by coercive methods. The purpose in playing the tape as stated by the prosecutor was to let the jury determine whether the statement had been coerced and to show the propriety of having charged the witness with perjury.

ing surprise and substantial harm to the propounding party by providing that either party

may impeach any witness. *Id.*, n. 3.

In this context, the fact that the tape recording was played for the jury in closing argument does not require that defendant's conviction be reversed. At the point that defense counsel suggested that the perjury charge was an unfair and unwarranted tactic employed by the prosecution, the contents of the taped statement took on independent relevance as the justification for bringing the charge of perjury.

Furthermore, as substantially the same subject matter was properly testified to by the witness on direct examination, it was not error to permit the prosecutor to replay the taped statement during his closing argument, even though the tape itself was not in evidence. *State v. Baker,* 548 S.W.2d 572, 573 (Mo.App.1975); *see also State v. Leonard,* 606 S.W.2d 403, 408 (Mo. App.1980); *State v. Smith,* 534 S.W.2d 604, 610 (Mo.App.1976), to the same effect.

■■■ Defendant further contends that Sandra Byrd was improperly recalled as a witness after being charged with perjury. The basis for defendant's argument is that the prosecutor did not have probable cause to initiate the perjury charge and therefore violated the ethical command of Rule 4, DR 7–103(A) which forbids a public prosecutor from instituting criminal charges "when he knows or it is obvious that the charges are not supported by probable cause." *Id.* It is apparent from the conflict between the witness' earlier statement and her direct testimony that probable cause existed within the meaning of the rule.

■■■ Defendant suggests that the issue of probable cause is affected by the inadmissibility of the witness' earlier statements as hearsay. Such prior declarations are admissible in a prosecution for perjury, even though evidence of declarations contrary to later sworn testimony is not sufficient to support a conviction for perjury, absent some corroborative evidence tending to show that the later testimony is

false. *State v. Carter,* 315 Mo. 215, 285 S.W. 971 (1926). It is unnecessary here to determine whether there was sufficient evidence available to the prosecutor at the time of the charge to support an eventual conviction for perjury. It is enough that the charge was initiated on the basis of probable cause.

■■■ The decision to permit the prosecution to recall a witness in order to recant previous false testimony is within the trial court's discretion. *State v. Couch,* 567 S.W.2d 360, 362 (Mo.App.1978). No abuse of discretion occurred here.

The jury was fully apprised of all the circumstances surrounding the charge of perjury against Ms. Byrd and its subsequent dismissal in exchange for her testimony. Therefore the credibility of her testimony was a matter for jury consideration and did not affect its admission. *State v. Holt,* 592 S.W.2d 759, 774 (Mo. banc 1980).

■■■ Defendant next charges error in permitting the bookkeeper of defendant's employer to testify concerning details of the car in which defendant was seen on the morning of the killings. The contention is that hypnotic procedures were improperly utilized to suggest those details to the bookkeeper.

On the morning of the killings, as the bookkeeper arrived at work she noticed defendant sitting in a car other than the one he normally drove. She gave police a general description of the car as to make and color. During the course of the investigation, she was shown an automobile on a police impound lot which she identified as the one in which defendant had been sitting. The car bore the license tag "BOOTSIE";[6] it also had some dents, missing molding and missing hubcaps. As a result of this showing, she recalled that the car she had previously seen had also had the license tag "BOOTSIE" and had dents, missing molding and missing hubcaps.

---

**6.** The name "Bootsie" is significant, in that defendant's former cellmate testified that defendant identified the person with whom he committed the killings as the same person who brought

defendant's motorcycle to Savannah. Sandra Byrd identified "Bootsie" as one of the persons who had brought the motorcycle to Savannah.

The witness subsequently underwent hypnosis, but there is no indication that she remembered any additional detail as a result of being hypnotized. The hypnotic session therefore did not improperly suggest information to the witness. It added nothing. *See State v Little*, 674 S.W.2d 541 (Mo. banc 1984); *State v. Williams*, 662 S.W.2d 277, 281 (Mo.App.1983).

Defendant also suggests that the bookkeeper's identification of the person known as "Bootsie" was similarly tainted. However, there is a similar dearth of evidence that this identification in any way resulted from suggestion.

■■■■ We also cannot agree that the prosecutor's reference to hypnosis, in a question which was immediately withdrawn, resulted in an impermissible bolstering of the witness' credibility. Absent impermissible suggestiveness in the hypnotic process, the facts surrounding the hypnosis may be considered by the factfinder in determining the weight and credibility of the hypnotized witness' testimony. *See Little; State v. Williams*, 662 S.W.2d at 281; *State v. Greer*, 609 S.W.2d 423, 436 (Mo.App.1980).

Defendant next asserts that the state was improperly permitted to introduce evidence of defendant's character. Defendant made known his intention to call a witness during the sentencing phase of trial who would testify that defendant received a nomination from the Grand Jury Association of St. Louis for a good citizenship award in connection with his assistance in a burglary investigation. The prosecutor responded that such evidence would open up the issue of defendant's character in general and that he would anticipate asking the witness if he knew about defendant's involvement in robbery and murder in Georgia. He also stated that he would have testimony "as to murder and robbery." The trial court stated that defendant's proposed testimony would open up the issue of his character and that the prosecutor would then be "allowed to rebut that evidence." Defendant then asserted that the arrests

occurred after the nomination was made. The prosecutor then proposed to question the witness concerning crimes which predated the nomination. The trial court again stated that the prosecutor would be allowed to rebut.

The substance of defendant's argument appears to be that the state should not be allowed to ask a witness who testifies to a specific act of good character about specific instances reflecting upon defendant's reputation for bad character. However, we do not accept defendant's characterization of either the proposed testimony or the proposed cross-examination.

The witness' testimony would have shown more than a previous instance of good conduct. It would have shown the association's opinion of defendant's "good citizenship" in light of that conduct. As clarified by argument of counsel, the trial court's ruling would have permitted inquiry into whether the association was familiar with reputed acts of misconduct when it arrived at its opinion.

■■■■ The state may cross-examine a witness to defendant's good reputation regarding the fact of prior arrests in order to test both the witness' familiarity with the reputation and the stringency of the standard under which that reputation was earned. *State v. Smith*, 655 S.W.2d 745, 749 (Mo.App.1983). Likewise, if a witness testifies to his own (or in this case someone else's) opinion of defendant's character, then the prosecutor may test the legitimacy of the basis for that opinion by inquiring whether the witness (or the other person) is aware of pertinent bad acts of defendant, including his arrest on other charges. *State v. Rainey*, 137 Ariz. 523, 672 P.2d 188, 191 (Ariz.App.1983); McCormick, *Evidence* § 191, p. 569 (3rd ed. 1984). Hence, the prosecutor's proposed inquiry was not improper under the circumstances present.

Defendant argues that the death penalty is cruel and unusual punishment in that it is disproportionately applied to black defendants convicted of killing white victims. Defendant requested disclosure by the

prosecuting attorney of St. Louis County of all data regarding homicide warrants issued or refused since May 25, 1977. That request specifically sought information regarding, among other things, the race of the victim, the race of the defendant, whether the death penalty was requested and whether the death penalty was imposed.[7] Defendant sought to justify the request as necessary to support his motion to quash the indictment, which motion asserted that the homicide statutes resulted in the capricious, arbitrary and discriminatory application of the death penalty. Both the request for disclosure and the motion to quash were denied.

Defendant presented no evidence to the trial court in support of his claim of disproportionality, nor has he presented any such evidence on appeal. Without such evidence, it cannot be found that the imposition of the death penalty is constitutionally flawed.[8] Nor did the trial court abuse its discretion in denying defendant's request for disclosure. The motion to quash the indictment alleges only in the most general fashion that the death penalty is applied in an arbitrary, capricious and discriminatory manner. The request for disclosure does not further clarify the grounds for this challenge. Neither is there any indication in the record that defendant attempted either to particularize the scope of his challenge or to provide evidentiary support for his challenge through other means at his disposal.[9]

In *State v. Camillo*, 610 S.W.2d 116, 117 (Mo.App.1980), the defendant challenged his conviction for escape as a product of "selective prosecution," thereby implicating concepts of equal protection inherent in the due process clause of the Fifth Amendment. The request for disclosure of all records of escapes occurring in the prior twelve years and any resulting prosecutions was denied. In affirming the judgment, the court held that the defendant had failed to establish a "colorable basis" for his claim of selective prosecution. *Id.* at 121. In similar fashion, defendant in this case failed to establish a colorable basis for the relevancy of his request, either by clarifying the grounds for his challenge or by offering other available proof in support of his claim.

Defendant's corollary argument that the death penalty constitutes cruel and unusual punishment has been adequately con-

7. The request also included information regarding: the age of the victim; the religion of the victim; the income level of the victim; the nationality of the victim; the gender of the victim; the relationship between the defendant and the victim; the age of the defendant; the religion of the defendant; the income level of the defendant; the nationality of the defendant; the gender of the defendant; the place of residence of defendant; the place of residence of the victim; the arrest and conviction records of the victim; the arrest and conviction records of the defendant; the circumstance of the homicide; the charge initially issued against defendant; whether defendant was offered a plea-bargain; whether the defendant went to trial or entered a guilty plea; the charge of which the defendant was convicted; the sentence the defendant received; whether the defendant was represented by retained or appointed counsel; whether the defendant was found incompetent to proceed to trial; whether, subsequent to a finding of incompetency to proceed to trial, the defendant was found fit to proceed to trial; and, whether the defendant was found to be incompetent at the time of the homicide.

8. A similar challenge to the disproportionate racial impact of Florida's death penalty statute was rejected on the merits by the Fifth Circuit, the court reasoning that "if a state follows a properly drawn statute in imposing the death penalty, then the arbitrariness and capriciousness—and therefore the racial discrimination—condemned in [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] have been conclusively removed." *Spinkellink v. Wainwright*, 578 F.2d 582, 613 (5th Cir.1978), cert. denied 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

9. In this respect most particularly, defendant's claim is distinguishable from that raised in *State ex rel. Garrett v. Saitz*, 594 S.W.2d 606 (Mo. banc 1980). In that case, relator sought to quash his indictment for murder on the basis that the grand jury master list did not adequately represent certain identifiable groups. This Court granted relator's request to compel disclosure of the challenged master list by the circuit clerk, since without that list relator would have no means of asserting his claim. No such singularity of the means of proof plagues defendant's challenge.

sidered and rejected by this Court and need not be readdressed. *State v. Laws*, 661 S.W.2d 526, 531 (Mo. banc 1983).

As a final point, we must consider the following: whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of a statutory aggravating circumstance enumerated in § 565.012, RSMo Cum.Supp.1983;[10] and, whether the sentence of death is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. § 565.014, RSMo 1978.[11]

Defendant does not contend and the record does not support a finding that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. *State v. Guinan*, 665 S.W.2d at 332; *State v. Gilmore*, 661 S.W.2d 519, 525 (Mo. banc 1983).

■ The evidence fully supports the jury's finding that the killings were committed for the purpose of receiving money or any other thing of monetary value. *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983); *Gilmore* at 525. The evidence also supports the conclusion that the killings were committed while defendant was engaged in the commission of another capital murder.

We also find that the sentence of death is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ The jury was required by the verdict-directing instructions to find that although the killings may have been committed by another, the defendant acted with the purpose of promoting or furthering the deaths of the victims.[12] The only evidence relative to defendant's state of mind regarding the killings reveals that he claims the killings to himself. Testimony revealed that he commended the practice of either killing or incapacitating robbery victims by shooting them in the head in order to prevent them from testifying.

■ Among cases involving robbery-murders in which the death penalty was imposed and affirmed, there are several that possess sufficiently similar circumstances to justify the sentence in this case. In *State v. Lashley, supra*, defendant killed a close relative while robbing her of $15, and the death penalty was imposed even though defendant was only seventeen years old at the time of the killing. In *State v. Laws, supra*, defendant was sentenced to death for the killing of an elderly couple during a robbery even though defendant did not fire the fatal shots. In *State v. Gilmore, supra*, defendant shot and killed an elderly woman in the course of a robbery, and the jury recommended death despite defendant's sixth grade education and borderline mental retardation. In *State v. McDonald, supra*, the robbery-murder victim was a police officer, killed in similar execution style as in this case. The defendant had served voluntarily and with a commendable record during the Vietnam conflict. It should be noted that only *Laws* involved multiple killings.

■ We do not consider cases in which the death penalty was waived, *State v. Lashley*, 667 S.W.2d at 716. Similarly, cases in which the jury was unable to reach

---

10. This section was repealed by Laws 1983, S.B. 276 § 1 and replaced by § 565.032, RSMo Cum. Supp.1983. The effective date of S.B. 276 was extended to October 1, 1984, by S.B. 448, 1984 Mo.Leg.Serv. No. 3 at 169.

11. This section was repealed by Laws 1983, S.B. 276 § 1 and replaced by § 565.035, RSMo Cum. Supp.1983. The effective date of S.B. 276 was extended to October 1, 1984, by S.B. 448, 1984 Mo.Leg.Serv. No. 3 at 169.

    We note also that proportionality review is not a constitutional requirement. *Pulley v. Har-*

ris, —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

12. This instruction satisfies the dictates of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which holds that the death penalty may not be assessed against one who assists in a robbery in which a killing is committed but who does not himself intend that a killing take place or that lethal force be employed.

a verdict as to punishment are not relevant to a comparison of circumstances between cases in which the jury imposed the death penalty and those in which the jury rejected the death penalty in favor of life imprisonment.

Judgment affirmed.

All concur.