

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,             )
                                )
        Plaintiff-Respondent,    )
                                )
v.                                )    No. SD37489
                                )    Filed: April 14, 2023
KENNETH L. LIVINGSTON,    )
                                )
        Defendant-Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF TANEY COUNTY

#### Honorable R. Craig Carter, Special Judge

**<u>AFFIRMED</u>**

Following a jury trial, Kenneth Livingston (Defendant) appeals from his convictions for the following six offenses:  the class A felony of murder in the second degree for shooting and killing his wife (Wife) (Count 1); the class A felony of murder in the first degree for shooting and killing Wife's mother (Count 2); the class A felony of assault in the first degree for shooting and wounding Wife's father (Count 3); and three counts of the unclassified felony of armed criminal action (ACA) (Counts 4-6).  *See* § 565.021;  § 565.020;  § 565.050;  § 571.015.[1]  Defendant was sentenced for these convictions as follows:  life without parole for first-degree murder on Count 2; life in prison for second-degree murder and for first-degree assault on Counts 1 and 3; and 30 years for

---

[1]  All statutory references are to RSMo (2016).

each of the three counts of ACA on Counts 4-6. All sentences were ordered to run consecutively.

Presenting two points on appeal, Defendant contends the trial court abused its discretion in admitting: (1) audio recordings of conversations between Defendant and Wife, secretly recorded by Wife, because the conversations were protected by "the privilege of marital communication" pursuant to § 546.260; and (2) expert testimony – "that a victim of domestic abuse is most at risk when they have first left an abuser" – because the testimony suggested Defendant and Wife's relationship was "permeated by domestic violence, although such facts were not in evidence." Finding no merit in either point, we affirm.

**Factual and Procedural Background**

On appeal, we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict; all contrary evidence and inferences are disregarded. *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). We defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez-McCurdy*, 266 S.W.3d 874, 876 (Mo. App. 2008). Viewed from this perspective, the following evidence was adduced at trial.

In late March 2018, Wife was in the process of divorcing Defendant. Wife and Defendant had three young sons, ages two, five and nine years old (hereinafter referred to collectively as the boys). Wife and the boys had moved in with her parents: Wife's mother (Grandmother) and Wife's father (Grandfather). Grandfather felt threatened by Defendant and did not want Defendant to come around the house.

2

Around the same time period, Defendant learned that Wife was having an affair with his cousin. On the morning of April 17, 2018, Defendant hacked into Wife's Facebook account and discovered messages from Wife to her friends about the affair. Defendant also searched the internet for: (1) "who gets custody if there's an affair"; and (2) flights to California, where all of his family lived.

Later that same morning, Defendant went to the home of Wife's parents to visit the boys. Grandfather was upset by Defendant's presence, but Defendant had been told that he could come and play with the boys. Defendant, however, wanted to take the boys away from the home. Wife and Grandmother insisted that the boys stay on the property. An argument ensued. Grandfather told them to take their argument out of the house and into the garage.

When the yelling and commotion persisted, Grandfather moved to the laundry room, off the hallway near the door to the garage, to monitor the situation. Grandmother, who was standing near the doorway to the garage, told Grandfather: "[Defendant]'s got a gun." Grandfather then ran to get his gun from his bedroom closet. Wife was still in the garage with Defendant and their five-year-old son (Son), who was watching nearby.

Defendant shot Wife in front of Son. Wife was shot twice in the right chest, in a "primarily downward" direction. Son reported that "his father put his mother down and shot her." Grandmother also witnessed the first shooting. Then, Defendant shot and killed Grandmother.

Defendant then stepped over Grandmother's body to go after Grandfather. Defendant ran down the hallway to Grandfather's bedroom. Defendant shot at Grandfather three times in his bedroom, hitting him in the arm once before running out of bullets. Grandfather hid in an adjacent bathroom, where he managed to return gunfire through a

3

closed door. Defendant was not hit. He ran back to the garage, put Son in his truck and fled the scene, leaving his two other children at the home.[2]

Wife lived just long enough to get to the backyard and call 911. She was unable to speak, however, and could only groan until she died during the call. Her body was found in the backyard by emergency medical personnel and police.

Grandfather applied a tourniquet to his arm, then crept down the hallway and saw his two-year-old grandson sitting in the dining room. He was not hurt but was "just screaming." Grandfather saw his phone on the table and called 911.

After leaving the scene, Defendant called 911 and claimed he was fleeing from Grandfather, whom Defendant said had shot him. Defendant acknowledged that he had fired his gun at other people still at the scene.

At trial, Defendant testified in his own defense. He claimed that Grandfather had threatened him with a gun at the door to the garage and that Grandfather began shooting, but all five shell casings in the garage were from Defendant's gun. Three more shell casings from Defendant's gun were found in the bedroom where Defendant shot at Grandfather. The only shell casings from Grandfather's gun were found in the bathroom adjacent to the bedroom, where Grandfather returned fire through the closed door.

Defendant made several admissions. He admitted that: (1) neither Wife nor Grandmother were a threat to him, and that he had shot and killed them; (2) the evidence established that Grandfather had not shot at him when he was in the garage shooting the others; (3) when he shot Wife, she and Grandmother were not next to each other; (4) Wife was in the garage to his left, and Grandmother was in the hallway near the door; (5) the

---

[2] During the shootings, the oldest, nine-year-old son was in a bedroom, asleep wearing headphones. The youngest, two-year-old son was somewhere inside the house.

4

evidence showed that he had stepped over Grandmother's body when going after Grandfather; (6) he shot every bullet in his gun; (7) he knew at the end of March that his marriage to Wife was over, and that Wife was divorcing him; (8) he "failed at being a husband, a good husband"; (9) he "thought" he "was losing" his boys; and (10) he told Wife that she "hadn't seen crazy yet" if another man attempted to parent the boys, and that he would go to prison for the rest of his life for what he would do.

The State's theory of the case was that Defendant was motivated by the loss of control over Wife and his desire to take custody of the boys. When all three victims refused to let Defendant leave with the boys, he sought to kill them.

The jury rejected Defendant's claims of self-defense and defense of others (based on the presence of Son) and found Defendant guilty as charged of all six offenses. This appeal followed. Additional facts will be included below as we address Defendant's two points on appeal.

### Standard of Review

Defendant's points both challenge admission of certain evidence at trial. A trial court has broad discretion to admit evidence at trial. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). Our review is for abuse of discretion. *See id*. A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances, and is so unreasonable as to indicate a lack of careful consideration. *Id*. On direct appeal, this Court also reviews for prejudice, not mere error. *Id*. at 223-24; *State v. Robinson*, 392 S.W.3d 545, 551 (Mo. App. 2013). "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have

reached a different conclusion without the error." ***State v. Miller***, 372 S.W.3d 455, 472 (Mo. banc 2012); ***State v. Ellis***, 512 S.W.3d 816, 825 (Mo. App. 2016).

## Discussion and Decision

### *Point 1*

Defendant's first point contends the trial court abused its discretion in admitting three audio recordings of conversations between Defendant and Wife, secretly recorded by Wife, because the conversations were privileged marital communications pursuant to § 546.260. This statute governs marital privilege and provides, in relevant part, that "in no case shall husband or wife, when testifying under the provisions of this section, be permitted to disclose confidential communications had or made between them in the relation of such husband and wife." § 546.260.1. The burden is on the defendant to establish that the privilege is applicable. ***State v. Turner***, 716 S.W.2d 462, 467 (Mo. App. 1986). The following facts are relevant to this point.

As part of the State's case-in-chief, the State called a criminal investigator, with the Missouri State Highway Patrol, specializing in phone forensics. The investigator performed an extraction on Wife's phone, retrieving several audio recordings. Among them were three audio recordings that Wife had secretly recorded on her phone. These recordings were identified as Exhibits 11-A, 11-D and 11-F.

Exhibit 11-A was recorded less than four weeks before the murders, on March 22, 2018, at 11:49 a.m. During this recording, Wife told Defendant, *inter alia*, that: (1) his abuse was "constant"; (2) he had called her "a cunt and a bitch all the way home the other day," and told the kids to "shut the fuck up"; (3) he used to tell her to get out, that he would take her kids from her and leave her "ass on the side of the road"; (4) now that her parents had land, instead he would "beat [her] down" and say she was "so pretty" thirty minutes

6

later; (5) he was "so mean" to her and to the boys that he caused her to cry all the time; and (6) their oldest son had watched Defendant "beat the shit" out of her and "got in between" them and told Defendant to stop. In response, Defendant sobbed and said he was sorry.

Exhibit 11-D was a recording that Wife had titled "Crazy Admit." It was recorded three weeks before the murders, on March 29, 2018, at 11:20 a.m. Defendant said he felt sorry for Wife's next boyfriend because he swore "on everything holy" that he would "go crazy" if he saw another man hug or touch his boys; he was "done, done," that she hadn't "seen crazy," and that he would spend the rest of his life in prison for what he would do. Defendant then asked one of the boys: "Right, Bubba? She hasn't seen crazy yet."[3]

Exhibit 11-F, another "Crazy" recording, was also recorded on March 29, 2019, but a few minutes later, at 11:28 a.m. In this recording, Defendant threatened to spend the rest of his life in prison if the boys "ever" called another man "dad," or if another man took them to soccer games. Defendant continued: "I won't let it happen" and if "you think I'm crazy right now, wait until that day comes!" Defendant said this was "not a threat, it's a promise."

When the State sought to admit the three audio recordings, Defense counsel objected, arguing that the audio recordings were protected by marital privilege pursuant to § 546.260. The State, however, maintained that the audio recordings were: (1) "threats" – not protected by marital privilege; and (2) "statements by a party opponent" that "come into evidence through the admissions by a party opponent." The trial court agreed with the State. With respect to the second and third recordings, Exhibits 11-D and 11-F, the court

---

[3] Defendant concedes that because one of the boys was present when he made the last statement, he and Wife were not alone, and therefore, that statement was not protected by marital privilege. *See Turner*, 716 S.W.2d at 467 (burden on defendant that marital privilege applies, including that spouses "were alone when the exchange took place").

7

limited play of both exhibits to Defendant's threats only. As for the first recording, Exhibit 11-A, the trial court limited play of the recording to "Defendant's voice whenever he says these admissions against [his] interest." The court explained that "you have to play her statements and then his statement, 'I'm sorry' in context. And that makes it admissible." The court also stated that Defendant's admissions were "different" from Wife making statements that were recorded.[4]

Defendant's first point argues that: (1) the three audio recordings "were made in private and did not contain any communications that would exempt them from the confines of the privilege of marital communication"; and (2) "[w]ithout these recordings there is a reasonable probability the jury would have found [Defendant] either acted in self-defense or would have convicted him [of] lesser-included offenses." According to Defendant, admission of Exhibits 11-A, 11-D and 11-F was an abuse of discretion. We disagree.

The prohibition against the disclosure of "confidential communications" under § 546.260 is not absolute, and there are "a number of exceptions based on good cause and public policy[.]" *State v. Heistand*, 708 S.W.2d 125, 126 (Mo. banc 1986). "[A]s a matter of public policy, the husband-wife privilege" does "not apply to communications relating to contemplated future crime." *Id*. Further, "threats of violence by one spouse against the other are not considered confidential communications within the meaning of § 546.260." *State v. Wolford*, 754 S.W.2d 875, 881-82 (Mo. App. 1988); *see State v. Applegate*, 668 S.W.2d 624, 635 (Mo. App. 1984); *State v. Johnson*, 586 S.W.2d 437, 441 n.3 (Mo. App.

---

[4] Defense counsel obtained a continuing objection that all three exhibits were protected by marital privilege. This issue was included in Defendant's motion for new trial.

1979).[5]  The policy underlying § 546.260 is "intended to protect the marital relationship and to foster family peace." **State v. Byrd**, 676 S.W.2d 494, 501 (Mo. banc 1984).  That policy is not served by preventing the State from calling a spouse as a witness where the defendant admits that there was no marriage relationship.  *See id.*  Where the evidence contains no confidences within the marital relationship, it is admissible.  **Heistand**, 708 S.W.2d at 127.

We find no abuse of discretion in admitting Defendant's "Crazy" admissions in Exhibits 11-D and 11-F.  These admissions were clearly threats – even a "promise" – of a crime of violence against another man, and that Defendant was willing to spend the rest of his life in prison for committing such crime.  *See id.* at 126 (marital privilege does not apply to communications relating to future contemplated crime).  As such, the audio recordings are not protected "confidential communications" within the meaning of § 546.260.  **Heistand**, 708 S.W.2d at 127; *see, e.g.*, **Wolford**, 754 S.W.2d at 881-82 (holding that the trial court did not err in overruling defendant's objection, based on marital privilege, to admission of wife's tape-recorded conversation in which defendant threatened to kill wife and her boyfriend).

We similarly find no abuse of discretion in admitting Defendant's admissions in Exhibit 11-A. As with all three recordings, Exhibit 11-A was discovered by police through routine investigation of Wife's phone.  Contrary to Defendant's argument, the recording was not offered as Wife's testimony, and therefore was *not* testimonial, and did not implicate § 546.260 (prohibiting spouse from "testifying").  The trial court clarified that it

---

[5]  Similarly, marital privilege also does not protect threats of violence made by a defendant directed at a child of the witness spouse. **Wolford**, 754 S.W.2d at 882; *see also* **Heistand**, 708 S.W.2d at 126 (spouse "may testify as to statements by the other which have a bearing on fitness to have custody of children"); **T.C.H. v. K.M.H.**, 693 S.W.2d 802, 805 (Mo. banc 1985) (similar holding).

9

was not Wife's statements, but Defendant's admissions in the context of Wife's statements, that were admissible. *See Ellis*, 512 S.W.3d at 829 n.12 (an "admission" is a statement or conduct that tends to incriminate or connect that party with the crime charged). Further, "admission of a party opponent is not hearsay." **State v. Simmons**, 233 S.W.3d 235, 237 (Mo. App. 2007); *see, e.g.*, **State v. Mueller**, 598 S.W.2d 564, 567 (Mo. App. 1980) (defendant's recorded admissions were exceptions to the hearsay rule because they constitute admission against interest); *see also* **State v. Morris**, 654 S.W.2d 186, 187 (Mo. App. 1983) (hearsay rule can only be satisfied if admission is offered by the party opponent because that party has no need to test his own credibility and can take the stand to explain). Thus, Defendant's admissions were properly offered and admitted as admissions by a party opponent. **Mueller**, 598 S.W.2d at 567; *see* **Simmons**, 233 S.W.3d at 237.

There is another reason why marital privilege does not apply to Exhibit 11-A. In late March 2018, when the recording was made, the evidence showed there was no marital relationship. Defendant and Wife were separated, and Defendant admitted that he knew the marriage was over, and that Wife was divorcing him. "A person may not justifiably rely on the confidentiality of a marital relationship if he has no reason to believe that relationship exists." **Byrd**, 676 S.W.2d at 501-02; *see* **State v. Hopkins**, 140 S.W.3d 143, 161 (Mo. App. 2004) (wife testified "the only reason she had not yet divorced was because she lacked the financial means to do so, showing that the separation was intended to be permanent"; defendant not entitled to invoke marital privilege)[6]; *see also* **United States v. Jackson**, 939 F.2d 625, 627 (8th Cir. 1991) (holding that marital privilege does not protect information communicated after the couple has permanently separated, reasoning that

---

[6] **Hopkins** was abrogated on other grounds by **State v. Jones**, 479 S.W.3d 100 (Mo. banc 2016).

10

although defendant and his wife were not divorced, couple was "permanently separated without any semblance of marital relationship at the time of the communication").

Lastly, assuming *arguendo* that the marital privilege applied and the trial court erred in admitting Exhibit 11-A, Defendant has failed to show the requisite prejudice. *See Miller*, 372 S.W.3d at 472. Defendant cannot show that admission of the exhibit "so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id*.; *Ellis*, 512 S.W.3d at 825. Here, the evidence against Defendant was overwhelming. The only shell casings found in the garage, where Wife and Grandmother were shot, were from Defendant's gun alone. There was no evidence that Grandfather began shooting in the garage and that Defendant was acting in self-defense. The shell casings found in the bedroom and bathroom were consistent with Grandfather's version of events. Defendant shot Wife, shot and killed Grandmother, then ran after Grandfather, shooting and wounding him before Defendant ran out of bullets. There is no reasonable probability that the jury would have reached a different result had the court not admitted Exhibit 11-A. For all these reasons, Point 1 is denied.

*Point 2*

Point 2 contends the trial court abused its discretion in overruling defense counsel's objection and admitting testimony from a domestic-abuse expert, who testified, *inter alia*, "that a victim of domestic abuse is most at risk when they have first left an abuser[.]" According to Defendant, this testimony was "highly prejudicial" as it suggested Defendant and Wife's relationship was "permeated by domestic violence, although such facts were not in evidence." We disagree.

11

We find no abuse of discretion in admitting the challenged testimony. Defendant's second point assumes that this Court granted his first point, finding error in admitting Exhibits 11-A, 11-D and 11-F. As previously established, however, these exhibits were properly admitted. In Exhibit 11-A, Defendant admitted to "constant" verbal and physical abuse of Wife. The record also includes other evidence from Grandfather of Defendant's threatening behavior. Grandfather testified he felt threatened by Defendant and did not want him to come around the house after Wife moved in with the boys. Thus, contrary to Defendant's argument, facts were in evidence suggesting that his relationship with Wife was indeed "permeated by domestic violence." As such, Defendant cannot show the expert testimony was "highly prejudicial" as he claimed.

Similarly, as in his first point, Defendant has failed to demonstrate the requisite prejudice necessary for reversal. *See Miller*, 372 S.W.3d at 472; *Ellis*, 512 S.W.3d at 825. Here, given the overwhelming evidence against him, there is no reasonable probability that the jury would have reached a different result had the court not admitted the challenged expert testimony. Accordingly, Point 2 is denied.

The judgment of the trial court is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

MARY W. SHEFFIELD, J – CONCUR

GINGER K. GOOCH, J. – CONCUR