STATE of Missouri,
Plaintiff-Respondent,
v.
Joseph Dean MOORE,
Defendant-Appellant.

No. 49107.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 20, 1986.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
June 19, 1986.
Application to Transfer Denied
Sept. 16, 1986.

William L. Webster, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Robert A. Hampe, St. Louis, for defendant-appellant.

SIMON, Judge.

Defendant, Joseph Dean Moore, appeals his sentences for assault in the first degree, § 565.050 RSMo 1978, (Count I) and two counts of exhibiting a lethal weapon in an angry or threatening manner, § 571.030 RSMo Supp. 1984, (Counts II and III). Following the jury's verdict in the Circuit Court of the City of St. Louis, defendant was sentenced to ten years on Count I, six months on Count II which was to run concurrently with the sentence imposed on Count I, and six months on Count III which was to run concurrently with the sentences imposed on Counts I and II.

On appeal, defendant contends that the trial court erred: (1) in failing to instruct the jury on self-defense; (2) in refusing to order sanctions for the state's failure to provide full and complete discovery of the victim's medical records; and (3) in failing to grant a mistrial where the state failed to provide defendant with the conviction records of its witnesses. We reverse and remand for new trial on the assault in the first degree (Count I) and we affirm on the exhibiting a lethal weapon charges (Counts II and III).

Defendant does not challenge the sufficiency of the evidence. On September 19, 1983, at about 8:00 p.m., defendant and a friend, Sharon Brinkman, were walking north on the sidewalk on the west side of Grand Avenue in the City of St. Louis. As they were walking past the White Castle restaurant near the intersection of Grand and Gravois, a car pulled in the restaurant's driveway only a few feet away from defendant and his friend. Defendant testified that the car nearly hit his friend, so he pushed her out of the way and then dropped a soda can on the car's windshield. The driver of the car, Arthur Lacy, immediately stopped and got out of his vehicle, and then asked defendant why he dropped the can on his car. Lacy testified that defendant laughed and stated he could do what he "damn well" pleased. Defendant testified that he did not laugh or make that statement, but he asked Lacy why he turned into the driveway so fast. Defendant and his friend then walked across Grand Avenue, consisting of four traffic lanes and two parking lanes. Lacy followed them across the street, and he admit-

ted he was mad at defendant and was cursing at him. Defendant testified Lacy threatened to "bust" his face if he caught him.

After that point in time, the testimony was more conflicting. Defendant testified that when he got to the curb on the other side of the street, he turned around and Lacy was "right up on" him. He stated he did not know until he turned around that Lacy was so close behind him. Lacy had a "real bad look on his face" which scared defendant. Defendant pulled a gun from the back of his pants, and Lacy said he was going to shove it up defendant's "ass." Defendant warned Lacy to go back to his car, that they did not want trouble with him, and he fired a warning shot in the air over Lacy's head. Lacy grabbed defendant's shoulder, and then defendant shot him. They both fell to the ground, and defendant got up and ran away. He stopped after two police officers chased after him and he realized they were shooting at him. Defendant testified that at no time did he point his gun at the police officers. He also testified that he told Lacy a total of about five times that he did not want any trouble.

Lacy testified that when he was about a step or two away from defendant, defendant pulled the gun out and shot at him. Lacy twisted to his right, and the bullet missed him. Then Lacy lunged at defendant, and while the two men were struggling, they went to the ground. As defendant got out from underneath Lacy, he shot again and this bullet hit Lacy in the abdomen.

Two police officers testified that they were traveling south on Grand in an unmarked police car immediately prior to the shooting, and they observed defendant, to their left, walking across the street and holding a gun in his right hand down by his side. They also observed defendant put the gun inside the rear waistband of his pants as he was stepping up to the sidewalk. A short distance after they passed defendant, the driver of the car, Detective Steve Alsup, made a U-turn so that the car

was facing northward a short distance south of where defendant was standing on the east curb. Alsup saw Lacy waving or moving his arms as he was walking quickly towards defendant. Just as Alsup completed the U-turn, he saw Lacy step on the east curb and Lacy appeared to be yelling at defendant, although Alsup did not hear what he was saying. Alsup further testified that when Lacy was about four to five feet away from defendant, defendant suddenly turned around and pointed the gun at Lacy. Lacy stopped and defendant fired a shot at him that apparently missed. Then Lacy lunged at defendant, the two men struggled, and as defendant got up he fired another shot directly at Lacy. The two police officers jumped from their car, identified themselves, and ordered defendant to drop his weapon. Defendant pointed the gun at the police officers, but his friend screamed, "No, Joe, No, Joe," and then he lowered the weapon and ran across a parking lot and down an alley. The police officers ran after defendant, ordered him to stop and Alsup fired two shots at him. Defendant then threw the gun to the ground, placed his arms in the air and surrendered. Ward Griggs, the other police officer, gave basically the same testimony as Alsup, although from his position in the front passenger seat of the car he could not tell if Lacy was yelling at defendant nor did he see defendant turn around suddenly before firing the first shot. He reiterated that defendant fired both shots directly at Lacy, and he stated he did not see defendant fire a warning shot into the air.

Jerome Stoker testified that he was at a service station parking lot which was across the street from the White Castle restaurant. He saw Lacy drive in the driveway close to where defendant and his friend were standing, and he saw defendant drop the can on Lacy's car's windshield. He also observed Lacy walk quickly across the street after defendant, but he did not remember if Lacy was yelling at defendant. He testified that before Lacy even made it to the curb, defendant pulled out the gun and shot him. Stoker was only about fif-

teen yards from defendant when this happened. He did not know where Lacy was when defendant fired the second shot, and he did not remember any physical contact or struggle between Lacy and defendant. He observed the police officers get out of their car and chase defendant, but he did not know whether defendant pointed his gun at the police. Although Stoker did not testify concerning his criminal record, the state later revealed in chambers that he was on probation when he testified.

At the time of the shooting, defendant was twenty years old, was 5'2" tall, and weighed 116 pounds. Lacy was 6 feet tall and weighed 235 pounds. Lacy also testified that immediately prior to the shooting, he had consumed alcoholic beverages, which consisted of about two or three "high balls."

The state introduced Lacy's medical records showing that he was hospitalized for a gunshot wound to the abdomen from September 19, 1983 through October 6, 1983. Defendant introduced his medical records showing that he suffered from Hodgkin's Disease. Defendant testified that he had this disease at the time of the shooting and that it made him tired, weak, and short-winded. He had under went radiation treatment prior to the shooting, and he had first and second degree burns under his arms, on his chest, and on part of his face. In addition, he had a broken hand, with three different pins in it and he was taking medication for pain. He further testified that he had the gun that day because he had gotten a telephone call from the hospital and he was going to shoot himself. However, he admitted that he told the police after the shooting that he had the gun because he had some problems with some people, and stated that he thought it would have been stupid to tell the police he had the gun because he was having physical and mental problems.

In defendant's first point, he contends that the trial court erred in failing to instruct the jury, in relation to the assault count, on self-defense as contained in Instruction A tendered by defendant. In de-termining whether there is sufficient evidence for a self-defense instruction, we consider the evidence in the light most favorable to defendant, and ignore the state's evidence except where it is favorable to defendant. *State v. Stubenrouch*, 591 S.W.2d 42, 43 (Mo.App.1979). Even where the evidence is conflicting or of such character that different inferences might reasonably be drawn therefrom, it is generally a question of fact for the jury to determine whether the accused acted in self-defense. *State v. Jackson*, 522 S.W.2d 317, 319 (Mo.App.1975). The quantum of proof necessary to require the giving of a self-defense instruction has been variously defined as "substantial evidence," "evidence putting it in issue," "any theory of innocence ... however improbable that theory may seem, so long as the most favorable construction of the evidence supports it," "supported by evidence," "any theory of the case which his evidence tended to establish," "established defense," and "evidence to support the theory." *State v. McQueen*, 431 S.W.2d 445, 448–49 (Mo.1968). Defendant's testimony tending to show that he acted in self-defense, by itself, is sufficient substantial evidence to require a self-defense instruction. *State v. Boyd*, 498 S.W.2d 532, 534 (Mo.1973).

Deadly force may be used in self-defense only when there is: (1) an absence of aggression or provocation on the part of defendant; (2) a necessity, real or apparent, for defendant to use deadly force to save himself from immediate danger of serious bodily injury or death; (3) a reasonable cause for the defender's belief in such necessity; and (4) an attempt by defendant to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984); *State v. Isom*, 660 S.W.2d 739, 742 (Mo.App. 1983). Further, he must retreat if retreat be practicable where defense of habitation is not involved. *State v. Ivicsics*, 604 S.W.2d 773, 777 (Mo.App.1980). We recognize that these elements are not materially different in a case involving murder or

involving assault in the first degree, as in this case. *See State v. Spencer*, 307 S.W.2d 440, 443 (Mo.1957).

Our Supreme Court dealt with the issue of when a self-defense instruction is required in *Chambers*, 671 S.W.2d 781. In *Chambers*, the victim got into an argument with one Jackie Turner at a tavern. At the owner's request, Turner and his family left the tavern. Chambers went to the tavern and asked for the Turners. He then left and returned with Turner. Upon entering the tavern, Chambers asked the victim to buy him a drink. After the victim refused, Chambers stated, "I thought you were a friend of mine," and the victim responded, "you're no friend of mine." Then the tavern owner told the two men to take their problem outside. After that point, the evidence is conflicting, but according to Chambers' evidence he drew a pistol after he was completely outside the door of the tavern. The victim initially approached Chambers and struck him in the face, knocking him to the ground. Chambers got up and shot the victim who staggered back to a wall. Then Chambers struck the victim several times with the pistol causing the victim to fall to the ground. Chambers was 5′6″ tall and weighed 150 pounds, and the victim was 6′4″ tall and weighed 250 pounds. Chambers tendered a self-defense instruction which was refused, and he was convicted of capital murder. Under these circumstances, our Supreme Court found that the trial court committed reversible error in failing to submit a self-defense instruction.

■ Reviewing the evidence in a light favorable to defendant's position and in relation to the *Chambers* elements, the evidence indicates that Lacy was the initial aggressor because he nearly hit defendant and his friend when he drove into the restaurant's driveway. The state responds that defendant was the initial aggressor because defendant dropped the can on Lacy's car's windshield. In any event, even if defendant was the initial aggressor, he effectively withdrew from the confrontation. *State v. Pride*, 567 S.W.2d 426, 430

(Mo.App.1978); *State v. Eldridge*, 554 S.W.2d 422, 425–26 (Mo.App.1977). Defendant walked across six lanes of Grand Avenue away from Lacy, and defendant told Lacy several times to leave him alone. Immediately prior to shooting Lacy, defendant again asked Lacy to go back to his car and that defendant did not want any trouble with him.

■ In relation to the second element, at 5′2″ tall and 116 pounds, defendant was no match for Lacy who was 6′ tall and 235 pounds. Defendant also had a broken hand, first and second degree radiation burns and was in a weakened condition because of Hodgkin's Disease. We recognize that something more than fear of size is required to justify the use of deadly force in self-defense, and that there must also be an affirmative action, gesture or communication by the person feared indicating the immediacy of the danger, the ability to avoid it and the necessity of using deadly force. *Chambers*, 671 S.W.2d at 783. In addition to defendant's physical disadvantage, Lacy threatened defendant. As defendant walked across the street, Lacy screamed that he would "bust" defendant's face if he caught him. Lacy continued to threaten defendant as he rapidly followed defendant across the street. Furthermore, defendant's evidence showed that he did not shoot Lacy until after Lacy threatened to shove the gun up his "ass," defendant fired a warning shot and Lacy grabbed the defendant. Thus, there was a real or apparent necessity for defendant to use deadly force to save himself from immediate danger of serious bodily injury or death.

Concerning the reasonableness of defendant's belief in the necessity of using deadly force, this issue is generally a question for the jury. As the court found in *Chambers*, this issue should be submitted to the jury. *Id.* at 783.

■ The final element is that defendant attempted to do all within his power consistent with his personal safety to avoid using deadly force. In relation to this element, the court in *Chambers* stated that a

person, because he is the physical inferior of another, is not bound to submit to a public assault. If he does not physically have the means of resistance, a weapon may be used. In resisting an assault, he is not required to determine with absolute certainty the amount of force necessary, but he cannot use more force than shall reasonably appear to him to be necessary under the circumstances. The *Chambers* court then noted that the victim was the initial aggressor and Chambers was no match for him. The court concluded that, "While appellant might have pursued a course of conduct other than shooting the victim, the reasonableness of such other conduct would be within the sound discretion of the jury." *Id.* at 783–84. Here, defendant was similarly, or even more at a disadvantage. Lacy was the initial aggressor and defendant withdrew after the initial confrontation. Defendant attempted to get away, clearly expressed his desire for peace, and warned Lacy to stop his advance. Thus, we conclude that the trial court erred in failing to submit a self-defense instruction in relation to the assault count.

Defendant made no specific allegation at trial, in his motion for new trial, or in his first point on appeal that the trial court's error in failing to submit a self-defense instruction prejudiced him on the two counts of exhibiting a lethal weapon in an angry or threatening manner. The self-defense instruction tendered by defendant submitted only the issue of self-defense as to the assault count. Thus, if there was any error in relation to the other two counts, it was not preserved. Rule 29.11. Furthermore, although the two counts of exhibiting a lethal weapon grew out of the same occurrence, they require distinct elements of proof not required by the assault count, and they are clearly separate statutory offenses. Thus, no double jeopardy results. *State v. Whitehead*, 675 S.W.2d 939, 943 (Mo.App.1984). Further, defendant has not indicated how or in what manner he was prejudiced in relation to the two counts of exhibiting a lethal weapon. We find none.

In defendant's second point, he contends the trial court erred in failing to grant a continuance, sanctions, or a mistrial because the state failed to comply with defendant's discovery requests concerning the victim's medical records in violation of Rule 25.03(A)(9). Defendant received copies of all of these medical records the day before any evidence was introduced, and two days before the medical records were introduced. He argued immediately prior to the admission of these records that he needed additional time to have the records reviewed by physicians. However, defendant did not argue at trial, nor does he argue in his second point, that this late disclosure was prejudicial in his conviction on the two counts of exhibiting a lethal weapon. He only argues that the medical records could have established the path of the bullet proving that defendant acted in self-defense. Defendant will have ample opportunity to establish this defense upon retrial of the assault count. Concerning the other two counts, defendant has failed to establish how he was prejudiced by the state's late disclosure, so his second point is denied. *State v. Estes*, 631 S.W.2d 121, 122 (Mo.App.1982); *State v. Davis*, 556 S.W.2d 45, 47–48 (Mo. banc 1977).

In defendant's third point, he alleges the trial court erred in failing to grant a mistrial because the state failed to provide defendant with the conviction records of the state's witnesses as required by Rule 25.03(A)(7). It appears that defendant did not complain of the state's failure in this regard until the instruction conference after all the evidence was presented. Defendant did not request that the trial court impose other sanctions, such as a continuance, before or during the testimony of the state's witnesses. At the instruction conference, the prosecutor admitted that she did not run checks on all of the state's witnesses, but she stated that one of them, Jerome Stoker, told her that he was on probation at the time of defendant's trial. She also stated that she knew the victim had no convictions, and she was not aware

that any of the other witnesses had any convictions. Defense counsel then stated that he found out on the evening before the last day of trial, after Stoker had testified, that Stoker was on probation for robbery. However, the record on appeal does not reveal whether the state disclosed this information to defense counsel or how he discovered it. Even though Stoker's conviction record did not come out in the testimony at trial, this was not prejudicial to defendant in relation to his conviction on the two counts of exhibiting a lethal weapon. Stoker's testimony was merely corroborative of that of Lacy and the two police officers. Thus, we find that the fact that Jerome Stoker had a conviction record was not evidence of such a character that, if known, it would have affected the result concerning the conviction on these two counts. *State v. Petree*, 568 S.W.2d 546, 549 (Mo.App.1978). Defendant makes no other specific arguments in relation to his third point, so he has failed to show how he has been prejudiced, and the conviction on the two counts of exhibiting a lethal weapon is affirmed. However, we do not condone the state's actions, and it must provide the conviction records of its witnesses on retrial of the assault count as required by Rule 25.03. Defendant's third point is denied.

Judgment reversed in part and affirmed in part.

KAROHL, P.J., and GAERTNER, J., concur.