STATE of Missouri, Respondent,

v.

Lonnie E. WOLFORD, Appellant.

No. WD 39300.

Missouri Court of Appeals,
Western District.

June 21, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 2, 1988.

Lonnie E. Wolford, Jefferson City, pro se.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SHANGLER, P.J., and LOWENSTEIN and GAITAN, JJ.

GAITAN, Judge.

Defendant, Lonnie Eugene Wolford, was found guilty by a jury in the Circuit Court of Buchanan County of murder in the second degree, § 565.021.1, RSMo (1986), assault in the first degree, § 565.050, RSMo (1986), and burglary in the first degree, § 569.160, RSMo (1986). Based on the jury's recommendations, he was sentenced by the court to consecutive terms of thirty years, fifteen years and eight years respectively. Defendant appeals alleging (1) insufficient evidence from which a second degree murder charge against him could be submitted to the jury; (2) the trial court erred in denying his motion to sever Counts II and III, which charged him with assault in the first degree and burglary in the first degree in connection with the stabbing of Robert Anderson, from Count I, which charged him with murder in the first degree in connection with the shooting of Ricky Blair; (3) ineffective assistance of counsel; (4) the trial court erred in allowing the state to reopen its case to read into evidence a letter written by a defense witness (5) the trial court erred in admitting into evidence a taped conversation between defendant and his wife; and (6) the trial judge erred in refusing to give an instruction on the defense of mental disease or defect. We affirm.

On April 10, 1986, Rick Blair was killed as a result of a gunshot wound inflicted by defendant. At the time of the shooting,

defendant and his wife, Debra Wolford, were estranged, and Mrs. Wolford was living with their two children and Rick Blair at a trailer court in St. Joseph, Missouri.

Defendant was distraught over the breakup of the marriage, was embroiled in a bitter custody battle with his wife, and was enraged by his wife's relationship with Blair, a friend and former employee of the defendant. On February 3, 1986, four days prior to separating from defendant, Mrs. Wolford tape-recorded a conversation in which defendant threatened to kill both Blair and his wife if she continued her involvement with Blair. During the recorded conversation, defendant told Mrs. Wolford, "I'm not gonna let you see Rick Blair in my house. There's no way. I'll kill you first. You can tell your lawyer that, but there's no way you can prove it. And I'm serious." When Mrs. Wolford asked defendant about what would happen if she saw Blair after the divorce, defendant answered:

What will happen to you, deary? I'll blow your m____ f___ing brains out, that's what will happen to you. And him, too. And me, too. We'll just all three go together. And don't think I wouldn't do it 'cause I would. My kids are taken away; I don't got nothing to live for anyway.

In the last excerpt of the conversation, defendant warned Mrs. Wolford that he was not going to allow Blair "or any other scurvy m____ f____ like that" to be around his children and threatened to "take that nice little .12 gauge of mine and blow your face from here to kingdom come."

Approximately two months later, during the evening of April 10, 1986, Mrs. Wolford heard a knocking at the door of her trailer home. When she answered the door, Mrs. Wolford found defendant standing in the doorway. He wanted to come in and speak with her and Blair. Mrs. Wolford informed him that Blair was asleep and suggested that they "go outside and talk." Defendant pushed his way through the door. Mrs. Wolford noticed that defendant's "left hand was behind his back." She reached behind his back and felt what she "believed

to be a gun." At that point, defendant brought what turned out to be a sawed-off .12 gauge shotgun from behind his back and pointed it at Mrs. Wolford's face.

Mrs. Wolford attempted to wrest the weapon away from the defendant, and both she and defendant fell to the floor. When she grabbed for the gun, the defendant repeatedly struck her with his hand. She screamed for Blair to wake up. Blair got up from the couch where he had been sleeping. As Blair started across the living room, defendant got to his feet, got at least one of his hands on the gun, and "gave it a great big jerk." Mrs. Wolford heard a blast, saw Blair stagger toward the defendant, and saw the appellant take Blair's hand and push him aside, causing Blair to fall onto the kitchen floor.

Mrs. Wolford testified that Blair was holding his hands up at "about shoulder height" and positioned about a foot away from the barrel of the shotgun at the time he was shot. A subsequent autopsy indicated that Blair died of massive shotgun wounds to the neck and chest.

After hearing the blast and seeing Blair fall, Mrs. Wolford wrested the gun away from the defendant, and the defendant told her, "He's dead and you will be next." She pointed the gun at defendant and tried to pull the trigger, but nothing happened. Mrs. Wolford ran down the hallway into the bathroom, shut the door and threw the gun underneath the bathroom vanity. The defendant forced his way into the room, grabbed Mrs. Wolford by the hair and began hitting her in the head and banging her head against his knees.

Mrs. Wolford struggled until she freed herself from defendant's grasp, ran out the front door, and ran to the trailer next door which was occupied by Jeannie and Robert Anderson. Mrs. Anderson, who had heard Mrs. Wolford's screams, opened the door, let Mrs. Wolford in and then locked the door. Mrs. Wolford ran to the back of the trailer to a bedroom used by the Andersons' two small children, closed the bedroom door and crawled underneath the bed. Mr. Anderson, having heard "a loud

bang" and Mrs. Wolford's screams had already called 911 for emergency assistance.

A few minutes later, Mrs. Anderson heard "a big thud." The trailer door "just swung open" and defendant entered the trailer. Mr. Anderson was again phoning for help. Defendant pulled out a buck knife and stabbed Mr. Anderson in the back. Defendant demanded to know where Mrs. Wolford was hiding, but Mrs. Anderson told him she didn't know what he was talking about and ordered him to leave the trailer. When Mrs. Anderson told him that the police had been called, the defendant yanked the phone off the wall and said he didn't care. He then turned to Mr. Anderson and said, "Buddy, you're dead."

The defendant again attempted to attack Mr. Anderson with the knife, but Anderson defended himself, first by using a beer bottle as a club and then by using a coffee table to ram the defendant. Mr. Anderson succeeded in knocking defendant down. He jumped over the defendant, ran to the back bedroom where his wife was also hiding, closed the door and leaned up against it to prevent the defendant from entering. The defendant tried to break down the door, but fled when police sirens were heard.

Mr. Anderson was stabbed three times in the shoulder and chest. He was taken by ambulance to a St. Joseph hospital where he was placed in intensive care for the treatment of his injuries which included a collapsed lung.

Testifying in his own defense, defendant stated that he was "upset" and couldn't eat or sleep as a result of the breakup of his marriage. He insisted that he took the shotgun with him when he walked through the door of his wife's trailer only because he believed Blair "had forced his way in" to the trailer and had "really knocked the heck out of Debbie." Defendant said his wife became hysterical when she noticed the gun, attempted to wrest it away from him, and that it accidentally discharged, striking Blair, when he gave the gun "a quick jerk" while his wife had her hand on the trigger.

The defendant testified that he was not sure why he entered the Anderson trailer, but knew at the time that he "just had to find Debbie." He said that Robert Anderson "hauled off and hit [him] with his fist" and he hit Anderson back. He testified that, during the ensuing struggle, he stabbed Anderson in the back because Anderson wouldn't let him go. Defendant said that he didn't actually remember stabbing Anderson, but that he "must have stabbed him."

In his initial point on appeal, defendant challenges the sufficiency of the evidence to support his conviction for murder in the second degree under § 565.021.1(2), RSMo (1986). He argues that the evidence was insufficient to support the jury's finding that he had deliberately or intentionally killed Rick Blair with the sawed-off shotgun. Defendant contends that the evidence suggests that "the gun in all reality, went off accidentally either while [he] and his wife were on the floor, each struggling to gain control of the weapon" or when Blair "grabb[ed] ahold of the end of the barrel and pull[ed] the weapon out of [defendant's] or his wife's hands."

■ To determine whether the state made a submissible case, we view the evidence and inferences in the light most favorable to the verdict and disregard all contrary evidence and inferences. *See, e.g., State v. Overkamp*, 646 S.W.2d 733, 736 (Mo.1983); *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980). We do not substitute our judgment for that of the jury; we determine whether there was sufficient evidence from which reasonable persons could have found the defendant guilty as charged. *See, e.g., State v. Porter*, 640 S.W.2d 125, 126 (Mo.1982). Viewed in this light, the evidence was sufficient to establish beyond a reasonable doubt that the defendant was guilty of second degree murder in connection with Blair's death.

A person commits the crime of murder in the second degree if he knowingly causes the death of another person. *State v. McKinzie*, 736 S.W.2d 571, 575 (Mo.App. 1987). Since it is undisputed that Blair was killed at close range by a shotgun blast

fired from a weapon that defendant was holding, the only real question presented is whether there was sufficient evidence to enable the jury to determine that the defendant intentionally fired the gun.

■ Mental elements establishing that a defendant knowingly did an act may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the incident. *State v. Turner*, 623 S.W.2d 4, 7 (Mo. banc 1981). Previous threats by the accused to kill the deceased are admissible to show an intent to kill or premeditation, and a jury may also infer a defendant's criminal intent from his declarations. *State v. Overkamp, supra*, 646 S.W.2d at 737.

In the present case, defendant's prior threats to kill both Blair and his wife with his .12 gauge shotgun, his unlawful entry into his wife's trailer home while armed with that shotgun, and his actions and statements immediately following the shooting, including his pursuit of his wife and his assault upon Robert Anderson, constituted sufficient evidence from which the jury could have reasonably found that the defendant intentionally fired the shot that killed Blair and knowingly caused his death. Therefore, the trial court did not err in overruling defendant's motion for a judgment of acquittal at the close of evidence.

■ In his second point on appeal, defendant attacks the trial court's refusal to sever Counts II and III of the information which charged the defendant with assault in the first degree and burglary in the first degree in connection with the stabbing of Robert Anderson, from Count I of the information which charged defendant with murder in the first degree in connection with the shooting of Rick Blair. The defendant contends that Counts II and III should have been severed from Count I because the three charges were not parts of the same crime scheme in that the shoot-

ing occurred at his wife's residence while the assault and burglary occurred at a later time "at a completely different residence." The point is without merit.

■ Section 545.140.2, RSMo 1986 provides:

[T]wo or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or infractions, or any combination thereof, are of the same or similar character or are based on the same act or transaction *or on two or more acts or transactions connected together or constituting parts of a common plan or scheme.*

(emphasis added). *See also* Rule 23.05, RSMo 1986.[1] Thus, separate offenses may be joined if they are based on acts or transactions that are part of a common plan or scheme. *See State v. Schubert*, 747 S.W.2d 165, 167 (Mo.App.1988). In determining whether the joinder of charges was proper, only the state's evidence is considered. *State v. Clark*, 729 S.W.2d 579, 582 (Mo.App.1987); *State v. Smith*, 682 S.W.2d 861, 683 (Mo.App.1984).

In the present case, the state's evidence indicated that the defendant was distraught over the breakup of his marriage, the potential loss of custody of his children and his wife's relationship with Blair. Defendant had threatened to shoot both his wife and Blair if she continued her relationship with Blair. After he killed Blair with a single blast from his shotgun, he told his wife, "He's dead and you will be next." Defendant pursued his wife to a next door neighbor's trailer where he broke down the door and assaulted Robert Anderson when neither he nor Mrs. Anderson would disclose the whereabouts of defendant's wife, who was hiding in a back bedroom. The state's evidence establishes that both the shooting of Blair and the assault on Anderson were part of a common scheme

---

1. Rule 23.05, as amended, effective July 1, 1986, now provides as follows:

   All offenses that are of the same or similar character or based on two or more acts that are part of the same transaction *or two or* *more acts or transactions that are connected or that constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts.*

or plan on the part of defendant to kill both his estranged wife and Blair. Therefore, there was no error in the joinder of the charges.

■ Defendant also seems to argue that, if his three convictions grew out of a common scheme or plan, the imposition of consecutive sentences under all three counts constituted double jeopardy. We disagree.

"[W]here a defendant is charged with several crimes in the same series of events and each crime requires proof of a fact distinct from the others, then there is no double jeopardy...." *State v. Whitehead,* 675 S.W.2d 939, 943 (Mo.App.1984) (citing *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 1293, 43 L.Ed.2d 616 (1975). The offenses for which defendant was convicted—murder in the second degree, assault in the first degree and burglary in the first degree—are all separate crimes with different constituent elements of proof. *See State v. Moore,* 711 S.W.2d 533, 538 (Mo.App.1986). Although these elements may have occurred during a continuous course of conduct within a relatively short period of time, the state is not prohibited from charging three separate crimes. *State v. Olsen,* 636 S.W.2d 318, 320 (Mo. banc 1982); *State v. Whitehead, supra,* 675 S.W.2d at 943–44. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535, 542 (1983). The intent of the Missouri legislature to prescribe separate punishment for the crimes of burglary, assault and murder is apparent and there is no statutory or constitutional prohibition against the imposition of consecutive sentences for these offenses.

In his third point on appeal, defendant asserts that his trial counsel was ineffective in failing to adequately raise the defense of not guilty by reason of mental disease or defect as outlined by § 552.030.1, RSMo (1986). The defendant contends that, although he entered a plea of not guilty by reason of mental disease or

defect, his attorney (1) urged him not to cooperate with the psychiatrist who performed the court-ordered examination; (2) never advised him of the results of the examination or allowed him to challenge the examiner's conclusions; and (3) never arranged to have the defendant examined a second time, even though his attorney solicited $1,000 from the defendant's mother and stepfather for such an examination.

■ The principal difficulty with defendant's arguments is that they are all outside the record. The defendant never objected to the efficacy of his trial attorney for any reason at the time of trial or in his motion for a new trial. Therefore, his complaints have not been properly preserved for review. *See State v. Crockett,* 543 S.W.2d 314, 322 (Mo.App.1976).

■ Nor is his claim of ineffective assistance of counsel supported by evidence contained in the record. For example, the defendant's insistence that his trial attorney told him not to cooperate with the psychiatrist who conducted the mental evaluation, and his claim that he was never informed of the results of the examination, have no evidentiary support whatsoever. Allegations asserted in an appellate brief which are unsupported by the record cannot form the basis of error on appeal. *State v. Carr,* 687 S.W.2d 606, 611 (Mo. App.1985); *State v. Friend,* 607 S.W.2d 902, 904 (Mo.App.1980). Moreover, the affidavits and exhibits attached to the defendant's brief cannot be considered by this Court in determining this point. Where the claims raised on appeal are not supported by the record filed in the appellate court, evidentiary deficiencies may not be overcome by exhibits or appendices unilaterally attached to one party's brief. *State v. Philips,* 596 S.W.2d 752, 755 n. 1 (Mo.App. 1980); *State v. Drane,* 581 S.W.2d 89, 93 (Mo.App.1979). A party to an appeal may not supplement the record with affidavits attesting to matters or occurrences outside the record, since non-transcripted matters will not be considered on appeal. *State v. Matthews,* 512 S.W.2d 248, 249 (Mo.App. 1974). Because defendant's claim of ineffective assistance of counsel is not properly

preserved for review and is unsupported by the record, the point must be denied. *See State v. Mitchell*, 620 S.W.2d 347, 348 (Mo. banc 1981). Further, this matter is more appropriate for a Rule 29.15 review.

Defendant next contends that the trial court abused its discretion when it allowed the state to reopen its case to read into evidence a letter written to the defendant's attorney by George Forman, a consulting engineer hired by the defense to establish that the sawed-off shotgun might have discharged accidentally. In that letter, dated August 20, 1986, Mr. Forman indicated that the defendant had probably fired the weapon intentionally.[2]

Although the state had filed a request for discovery pursuant to Rule 25.05, RSMo (1986) asking for "[a]ny reports or statements of experts made in connection with th[e] case," the defendant did not disclose the letter until after Mr. Forman had testified and left the courthouse. The trial judge ruled that the prosecutor would be allowed to read the letter to the jury on rebuttal. The court subsequently fined defendant's attorney $100 for deliberately and inexcusably violating the rules of discovery.

When it came time for the state to introduce the letter in rebuttal, the assistant prosecutor who was handling the case apparently forgot about the letter and stated, "No rebuttal, your honor." The following morning he remembered the letter and sought permission from the court to reopen the case in order to place the letter in evidence. The defendant's attorney objected on the grounds that the state had already closed its case, but the trial judge overruled his objection. The letter was then read to the jury.

■ A trial court is vested with broad discretion in permitting the state to reopen its case. *State v. Sykes*, 628 S.W.2d 653, 657 (Mo.1982); *State v. Burns*, 671 S.W.2d

306, 309 (Mo.App.1984). In exercising its discretion, a trial court should consider whether the newly admitted evidence will surprise the defendant, whether the defendant has had an adequate opportunity to meet the proof, and whether the order of proof will prejudice the defendant. *State v. Sykes, supra*, 628 S.W.2d at 657; *State v. Burns, supra*, 671 S.W.2d at 310.

■ In the present case, the letter was deliberately withheld from the state until after Mr. Forman had testified. It is apparent from the record that the state was not made aware of the letter's existence until Mr. Forman alluded to the letter on cross-examination. But for the unethical conduct of defense counsel in withholding the letter, this evidence could have been introduced during the state's cross-examination of Mr. Forman. Furthermore, the defendant was advised that the state would be permitted to introduce the letter on rebuttal. Under these circumstances, defendant cannot claim that he was surprised, unprepared, or prejudiced by the order of proof. The trial judge did not abuse his discretion in allowing the state to reopen its case to inform the jury of the contents of the letter.

In his fifth point, the defendant claims that the trial court erred in overruling his objections to the admission of a tape-recorded conversation between himself and his estranged wife, Debra Wolford, in which he threatened to kill both Mrs. Wolford and her boyfriend, Rick Blair. Defendant contends that these threats were "confidential communications" between spouses that were barred from evidence in the provision of § 546.260, RSMo (1986).

■ Section 546.260 permits a husband or wife to testify against the other in any criminal proceeding to which the other spouse is a party, provided that the husband or wife does not "disclose confidential communications had or made between them

---

**2.** In the letter, Mr. Forman stated that the evidence suggested that Blair "was reaching for the weapon" when he was shot. The last paragraph of the letter reads:

  I do not find a clear basis of determination that Lonnie Wolford did not in fact have

control of the shotgun, and that he most likely pulled the trigger. It is apparently fact that Wolford brought the gun with him to the trailer where his wife lived: this clearly indicates an action taken with the intent to cause harm.

in the relation of such husband and wife." The statute's prohibition against the disclosure of "confidential communications", however, has not been construed to be absolute. *State v. Heistand,* 708 S.W.2d 125, 126 (Mo. banc 1986). Among other exceptions to the operation of the statute, *see, e.g., State v. Turner,* 716 S.W.2d 462 (Mo. App.1986) (marital privilege does not protect threats of violence made by defendant directed at a child of the witness spouse); *State v. Heistand, supra,* 708 S.W.2d at 126 (marital privilege does not apply to communications relating to future contemplated crime), threats of violence by one spouse against the other are not considered confidential communications within the meaning of § 546.260. *State v. Applegate,* 668 S.W.2d 624, 635 (Mo.App.1984); *State v. Johnson,* 586 S.W.2d 437, 441 n. 3 (Mo. App.1979). Therefore, the trial court did not err in overruling defendant's objection to the admission into evidence of the tape-recorded conversation in which defendant threatened to kill his wife and Rick Blair.

In his sixth and final point, defendant claims the trial judge abused his discretion in refusing to give an instruction on the defense of mental disease or defect.

Under the provisions of § 552.030.6, RSMo (1986), the defendant is presumed to be free of mental disease or defect and the issue of whether he had a mental disease or defect excluding criminal responsibility for his conduct is for the jury to decide upon the introduction of substantial evidence that defendant's mental condition prevented him from knowing or appreciating the nature, quality, or wrongfulness of his conduct, or rendered him incapable of conforming his conduct to the requirements of the law. *See State v. Middlemas,* 654 S.W.2d 355, 357 (Mo.App.1983). In the absence of substantial evidence to support a finding that the defendant suffered from such a mental disease or defect, an instruction on this issue is not required. *State v. Carr,* 687 S.W.2d 606, 609 (Mo.App.1985); *State v. Middlemas, supra,* 654 S.W.2d at 357.

The trial court found that there was no substantial evidence of mental dis-

ease or defect to warrant submission of the proffered instruction. We have examined the record carefully and find no error. Admittedly, defendant adduced testimony at trial which bore on the defense of not guilty by reason of mental disease or defect. Defendant's mother, Janet Grooms, and defendant's stepfather, Harold Grooms, both testified that defendant was emotionally upset and distraught over the breakup of his marriage, the possible loss of custody of his two children, and his wife's relationship with Rick Blair. Defendant testified that he was "upset" and couldn't eat or sleep as a result of the breakup. The defendant also seemed to suggest that he was in some dream-like state at the time he stabbed Robert Anderson. However, this testimony does not rise to the level of substantial evidence of mental disease or defect excluding responsibility within the meaning of Chapter 552. *See State v. Vansandts,* 540 S.W.2d 192, 204 (Mo.App.1976).

The judgment of the trial court is affirmed.

All concur.