**STATE of Missouri, Respondent,**

v.

**Michael B. HEDGE, Appellant.**

**No. WD 41015.**

Missouri Court of Appeals, Western District.

April 18, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 30, 1989.

Application to Transfer Denied Aug. 1, 1989.

L.R. Magee, Kansas City, for appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for respondent.

Before FENNER, P.J., and SHANGLER and BERREY, JJ.

BERREY, Judge.

Appellant, Michael B. Hedge, was convicted by jury trial of murder in the second degree a class A felony. From this conviction and subsequent sentence of life imprisonment the appellant appeals.

The appellant and the deceased victim, Nancy Phillips, were well acquainted. Appellant had known the deceased for about thirteen years and Nancy had been living with appellant for four or five days before her death. Their relationship had been a stormy one.

On October 8, 1987, they had been to the Sky Line Inn and engaged in an altercation to which the Riverside Police Department was summoned. Appellant had picked up the victim, thrown her to the floor and then taken her to his room. "She had blood coming from her nose and mouth ... bruises and contusions on the, on her face and abrasions on the arm. [sic] and brusing on the chest." Officer Derringer testified he could remember three prior calls wherein the victim alleged appellant had assaulted her. According to Derringer she did not want to make a report, only to be left alone.

Officer Derringer testified that on October 8, 1987, he transported Nancy to the hospital. Officer Lloyd arrested appellant and transported him to the station for booking. As appellant passed Nancy Phillips he told her "he was going to get her." According to Derringer, "She cowered back and she started crying," and "[h]e repeatedly told her he was going to get her." Nancy Phillips told Derringer that the appellant had said he was going to kill her. Both parties were intoxicated at that time.

There were other instances of violence in the couple's stormy history. Witness Wolfend testified she was present in July 1987, when appellant pushed Nancy Phillips down and said, "I'll kill you." At that time he pulled her by the hair, down the steps and then left.

Gary Crane, a neighbor of appellant, testified he had observed appellant on or about October 30, 1987, and a girl "hollering at each other and going up the street." She was shouting she wanted to leave and he was asking her to come back. They went up the street and sat down in the middle of the street. Crane then testified, "I heard her screaming again and I looked up and went to the door again and he was dragging her back down towards the house by the head of her hair." Later she left the house, and according to Mrs. Crane, appellant went after her on his motorcycle.

Several days later at about 10:00 p.m. on November 3, 1987, the police were dispatched to 5606 North Amoret, the address of the home in which appellant and victim had been living.

Officer Rollo, of the Kansas City Police Department, testified that she and Officer Wildman were riding as a two-man team and were dispatched under Code I, red lights and sirens, to 5606 North Amoret, arriving there about 10:00 p.m. They

found the victim in the bedroom being given CPR by firemen. The appellant and two other men were present in the house. Both appellant and Mr. Schwerger told Rollo that the victim had a head cold and was quite congested. Hedge told Rollo that Nancy Phillips was his girlfriend and that she had vomited and fallen earlier that day. Rollo observed a bruise on her right cheek and a cut on her right foot. According to Rollo, Hedge had told her deceased fell and broke "a pane of glass in the patio door."

Officer Robert Dodds, a Kansas City Police Department Crime Scene Investigator, testified he arrived at about 10:30 p.m., where he was met by Detective Mike McKee of the Kansas City Police Department Homicide Unit.

Dodds reported a number of findings, i.e., glass in sliding door fractured, stain on the wall of the hallway, numerous stains in bedroom where victim had been; on the walls, and on the mattress. George Burns, a Kansas City Police Department detective, and Detective Matlock went to the Platte County jail to interrogate appellant. Appellant was given his Miranda rights at this time. Appellant then agreed to go to Kansas City Police Department headquarters, 1125 Locust, and the parties repaired there. During appellant's first interrogation Burns testified that "he related that he probably had killed her, but that he had not meant to do so." Appellant told Burns that the victim had struck him and he retaliated by striking her three or four times.

Subsequently, during state's re-direct Burns stated he did not remember the exact words appellant used about victim's death. Burns said, "it was something to the effect of he must've been responsible for this."

The victim was transported by MAST ambulance to the emergency room at North Kansas City Memorial Hospital and was first seen by Dr. Robert Collier, the emergency room physician. She was admitted at 10:46 p.m. on November 3, 1987. According to Dr. Collier she was in a coma, had no pulse, no respiration and her heart stopped. She was given an I.V. with medication to stimulate the heart and was revitalized with the heart beat returning. Multiple lab tests were performed, x-rays taken and a C.T. scan of the head was ordered. The C.T. scan "showed some bleeding, which is called subdural hematoma," and "it showed a lot of swelling."

Dr. Collier stated this damage is most likely caused by trauma or "you know a blow to the head." Dr. Collier testified, "There are other causes of it, but, you know, with the, with the picture that we saw it looked like it was from trauma to us." According to Collier, doctors try and reduce the swelling and cause the patient to breathe rapidly. "Sometimes head injuries are so bad that there really is no treatment because it's, its really gone beyond the time you can really be effective in doing anything."

Dr. Collier described subdural hematoma as being both sudden and slow, "They're both, I guess that's the way to say it. There are slow bleeds called chronic or low grade subdural hematomas, and then there are acute subdural hematomas."

The state asked Dr. Collier:

Q. Repeated blows to the head, does that increase the chances of subdural hematoma?

A. Yes, it does.

Q. If a subdural hematoma already existed and there were additional blows to the head, would that aggravate the existing subdural hematoma?

A. Yes, it could.

On cross-examination Dr. Collier testified as follows:

Q. What kind of blows to the head are we talking about?

A. Well, I don't know, I wasn't there so I don't know what kind of blows—

Q. Well, I understand this, but you've been asked questions about do the blows to the head do this or do the blows to the head do that.

A. Sure.

Q. What kind of blows to the head are we talking about?

A. Well—

Q. Like so (indicates) or so (indicates) or so (indicates) or what?

A. Well, fairly high impact blows to he (sic) head.

Q. High impact, you mean up in the cranium top (indicates)?

A. No, it could be almost anywhere you can acceleration of the head, you know, where you get an acceleration and deceleration of the head, that can cause injury to the brain.

Q. So, the statement, quote, "blow to the head." unquote, is a rather all inclusive thing, it might mean anything, doesn't it?

A. I'm not sure I understand your question.

Q. Well, the undefined blow to the head you're telling us can be anything, is that what you're saying?

A. (No response.)

Q. Are you saying the blow has to develope [sic] so much acceleration, it has to have so much force, it has to have be hit someplace on the skull to do these things, or what are you saying?

A. What I'm saying is that the, whether the, whether the head, actually, what you should really look at is whether the head is hit or not is irrelevant, it's whether the brain actually gets, has an acceleration, in other words it is moved rapidly and then it stops rapidly.

The victim, Nancy Phillips, was pronounced dead at 3:24 a.m. on November 4, 1987. Dr. Paul Vescovo, the medical examiner for Clay County, Missouri, testified he performed the autopsy on Nancy Phillips. Dr. Vescovo stated Nancy Phillips had bruises and contusions to the face, bruising along the right cheek, and contusions and bruises along the nose. Her face was swollen, two-thirds of her lower lip bruised, her eyelids were swollen and the inside of her right and left elbow was bruised. Old bruises to her left arm were evident. The top of her right foot was bruised and a piece of skin torn. The back of her head was bruised and there was an old bruise on the pelvic bone. Her shins and legs both bore signs of old bruises.

Dr. Vescovo described these bruises in great detail, together with their location, and identified photographs of the areas he described. The doctor described injuries to the omental apron and injuries to the supporting mesentery of the intestinal tract. He also identified photos of these injuries together with photos of the skull and the hematoma. Dr. Vescovo testified "it would take a severe blow" to cause the damage found in the stomach; a kick to the stomach or fist would be hard enough to produce the injuries described. During the course of the autopsy Dr. Vescovo discovered Nancy Phillips had a fatty liver and he termed the condition as early cirrhosis of the liver.

The prosecutor asked Dr. Vescovo:

Q. Now based upon your experience as a medical examiner and your examination of Nancy Phillips do you have an opinion as to the cause of her death.

A. Yes sir. The cause of her death was due to brain injury which resulted in the stopping of her breathing and stopping of her heart. This was because of persistent increased intercramial pressure, pressure inside the head. Those really were the only injuries that I found that would be death inducing.

The doctor personally typed the death certificate and listed the cause of death as "massive injury to head and brain by blunt force."

The appellant alleges four points of error. According to appellant the trial court erred in denying his motion for judgment non obstante veredicto because: (1) state failed to prove corpus delicti, that appellant knowingly caused victim's death by his criminal agency; (2) state failed to prove cause of death by any act of appellant on November 3, 1987, or any other date; (3) to make the finding of guilt the jury had to stack inferences and such stacking will not support a conviction; and (4) the evidence was not sufficient to sustain a conviction.

When sufficiency of the evidence is reviewed, this court reviews the evidence in the light most favorable to the verdict. *State v. Rodden*, 728 S.W.2d 212, 213 (Mo. banc 1987).

While an appellate court does not second guess the jury, it will determine if the evidence was sufficient, that reasonable persons could have found the appellant guilty. *State v. Wolford,* 754 S.W.2d 875 (Mo.App.1988).

■ The appellant complains the state failed to prove the victim was murdered by the criminal agency of the defendant. This the state must establish. *State v. Howard,* 738 S.W.2d 500, 504 (Mo.App.1987). Both circumstantial and direct evidence may be used by the state.

Second degree murder is established by showing a wilful premeditated killing of a human being with malice aforethought. *State v. Mannon,* 637 S.W.2d 674, 678 (Mo. banc 1982). Intent is a prerequisite to a finding of second degree murder and may be inferred by the circumstances. *State v. Little,* 601 S.W.2d 642 (Mo.App.1980). Previous threats by accused to kill the deceased are admissible to prove the motive, premeditation or state of mind. *State v. Hunter,* 444 S.W.2d 392 (Mo.1969). From his declarations the jury may infer appellant's criminal intent. *State v. Goforth,* 535 S.W.2d 464, 467 (Mo.App.1976).

In appellant's video taped statement he admits striking Nancy at least seven times over six hours, trying "to get her to listen to me." The blows were all to the head and generally administered by the side or back of appellant's hand. Appellant acknowledges that two days before her death he pulled her down and she struck her head on the ground.

During interrogation he stated, "I didn't mean to hurt her." "I was wrong for slapping her." "I didn't try to beat her up." "I just lost my head, I guess, and I just slapped her upside of the head two or three times." During the previous four or five days defendant stated the relationship was violent and they were striking each other more than usual. In the interrogation Hedges also stated, "I slapped her again, three or four times, trying to knock some sense into her." Appellant acknowledged he "shouldn't have hit her," that, he'd "been drinking, probably excessively" and wanted to get her to go to the doctor.

The appellant admitted the altercation with Nancy at the Skyline Hotel some thirty days prior to her death. It was during this affray that he also ran her head through a shower door.

All of the appellant's declarations and actions on or before November 3, 1987, support the jury verdict. Under the circumstances the jury could reasonably infer that appellant intended to cause serious injury or death to Nancy Phillips.

Viewed in the light most favorable to the verdict there was sufficient evidence to believe appellant knowingly caused Nancy Phillips' death. This established the corpus delicti that appellant alleges was not established.

Appellant's next argument is that the state failed to prove Nancy Phillips' death was caused by act or acts of appellant. Appellant's claim of insufficiency of evidence was addressed *supra* and found wanting. That same detailed evidence and inferences drawn therefrom supports the finding that Nancy Phillips' death was caused by appellant. *State v. Wolford, supra,* 754 S.W.2d at 879.

■ The appellant further alleges that the jury impermissibly stacked inferences. Appellant argues the jury could only have found him guilty by stacking the inferences. He claims in fact that there was no evidence before the jury that the cause of death was from any criminal act of appellant on November 3, 1987, and no evidence existed of any criminal act by defendant against Nancy Phillips two or three days before. The appellant's memory is faulty. When asked by Officer Burns, of the Kansas City Police Department, "I understand. Did.... Were there other acts of violence and striking each other in this four days...." Hedge responded, "Yeah, more than usual in the last four days." Further, appellant admitted he had pulled Nancy Phillips back from walking on the street and she fell down and struck her head two days before her death. Appellant stated that Nancy Phillips had not been assaulted or beaten by anyone else in the last four

days appellant stated, "I wouldn't let nobody assault her."

The appellant cites, *State v. Taylor*, 356 Mo. 1216, 205 S.W.2d 734 (1947) and *City of Kansas City v. Ehringer*, 607 S.W.2d 845 (Mo.App.1980), but neither case is applicable to the facts herein and they are not dispositive. "An inference may not properly arise which is 'dependent for establishment of one fact upon inference to be drawn from some other fact shown only by inference.'" *State v. Gonzales*, 533 S.W.2d 268 (Mo.App.1976), (quoting *State v. Ring*, 346 Mo. 290, 141 S.W.2d 57 (banc 1940)). The evidence in the instant case is not built upon inferences arising out of other inferences drawn from the facts and circumstances surrounding Nancy Phillips' death. Rather, any inferences drawn by the jury were properly drawn from the evidence. Appellant is confusing the nature of circumstantial evidence with that of inference stacking. Thus, appellant's contention of improper inferences stacking is not tenable. Appellant's Point III is denied.

Finally, appellant argues, "the evidence was not sufficient to sustain a conviction" and the only cure is acquittal. This is virtually the same scenario that has been raised in the existing points. Sufficiency of the evidence has been fully fleshed out and the court finds there is sufficient evidence for a jury to convict. Appellant Point IV is overruled.

Judgment affirmed.

All concur.